IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JEREMY DEAR,

      Plaintiff,

v.                                                                            Civ. No. 21-00250 KG/JMR

SARITA NAIR, TIM KELLER,
and CITY OF ALBUQUERQUE,

      Defendants.

MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant Sarita Nair's Motion to Dismiss or, Alternatively, Exclude Plaintiff's Exhibit 4 as a Sanction, (Doc. 158), filed on January 13, 2025. Plaintiff filed his Response, (Doc. 161), on January 16, 2025. Defendant filed his Reply, (Doc. 162), on January 16. Having considered the briefing and the applicable law, the Court grants Defendant's Motion.

*I.*     *Background[1]*

On January 10, 2025, the Court held a pretrial conference. During the pretrial conference, the Court heard argument related to the parties' proffered exhibits. One of these exhibits—Exhibit 4—included a photograph of an email exchange between members of the City's legal team, Defendant Sarita Nair, and former Albuquerque Police Department Chief, Mr. Geier. Defendant raised concerns regarding Plaintiff's ability to authenticate the photograph of the email exchange. In response, Plaintiff—for the first time—acknowledged the source of the

---

[1] Because the facts giving rise to this case have been recited in previous Memorandum Opinion and Orders, the Court will not repeat them here. *See* (Docs. 80, 138).

photograph from Mr. Geier.  Draft Transcript of Pretrial Conference, 16:1–20 (taken January 10, 2025).[2]  Defendant then asserted that Mr. Geier did not have authority to waive the City's attorney-client privilege, and the photographed email was therefore improperly obtained and inadmissible.  The Court then ordered this expedited briefing to consider the matter fully.

In her Motion, Defendant argues that Plaintiff's counsel's eleventh-hour disclosure of Exhibit 4's source warrants dismissal of Plaintiff's remaining claim.  (Doc. 158) at 1–2.  For the reasons set forth below, the Court agrees.

## II.    *Legal Standard*

"All federal courts have 'inherent power[ ] ... to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  *Stenson v. Edmonds*, 86 F.4th 870, 875 (10th Cir. 2023) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)).  "This power includes the authority to 'fashion an appropriate sanction for conduct which abuses the judicial process.'"  *Id.* at 876 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)).  In determining whether dismissal is an appropriate sanction, a district court should consider the following five *Ehrenhaus* factors: "(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions."  *Id.* at 878 (quoting *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir. 1992)).

## III.    *Discussion*

---

[2] The Court's citation to the hearing's transcript refers to the court reporter's original, unedited versions.  Any final transcript may contain slightly different page and line numbers.

Here, Defendant argues dismissal is an appropriate sanction because Plaintiff and his counsel misrepresented and hid the Exhibit 4's source, which she claims is plainly privileged information. (Doc. 158) at 3–5. Because Defendant's dismissal argument is predicated on whether Exhibit 4 is privileged, the Court addresses that argument first.

A.  *Attorney-Client Privilege*

In federal question cases like this one, courts look to the federal common law to determine whether attorney-client privilege applies. *Sprague v. Thorn Americas*, 129 F.3d 1355, 1368–69 (10th Cir. 1997) (citations omitted). Under federal law, "attorney-client privilege protects confidential communications by a client to an attorney made in order to obtain legal assistance from the attorney in his capacity as a legal advisor." *In re Grand Jury Proceedings*, 616 F.3d 1172, 1182 (10th Cir. 2010) (internal quotation marks and citation omitted). This privilege also protects communications from attorney to client, "which would have a tendency to reveal the confidences of the client." *Id.* (citing Kenneth S. Brown, *McCormick on Evidence* § 89 (6th ed. 2006); *United States v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990) ("Communications from attorney to client are privileged only if they constitute legal advice, or tend directly or indirectly to reveal the substance of client confidence."). Additionally, work product protects "documents and tangible things that are prepared in anticipation of litigation or for trial or for another party or its representatives (including the other party's attorney…or agent)." Fed. R. Civ. P. 26(b)(3)(A).

"Unless applicable law provides otherwise, the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 170 (2011); *see also De Los Santos v. City of Roswell*, 2013 WL 12330144 (D.N.M), at *4 ("A

municipality can invoke the attorney-client privilege to protect communications between its representatives and attorneys regarding legal advice sought and received on behalf of the municipality.")

Here, there is no question, and Plaintiff does not dispute, that Exhibit 4 is privileged. *See* (Doc. 161) (arguing Exhibit 4 could be authenticated but failing to address Exhibit 4's privilege protections). Exhibit 4 clearly shows communication between City officials and attorneys providing confidential legal assistance. To begin, the individuals on the email string include: (1) then-City Attorney, Esteban Aguilar Jr., (2) attorneys providing legal counsel to the City, Melissa Kountz and Samantha Hults, (3) City Legal Department employees, Devon Moody and Kelley Haney, (4) Mr. Geier, in his role as APD Chief and (4) Defendant Nair, in her role as the City's Chief Administrative Officer. (Doc. 158) at 3.

Next, there is no dispute that the content of the email is the type of legal advice protected by attorney-client privilege. The email plainly details legal assistance provided to the City. *See* (Doc. 68-1). Moreover, the email's content centers around proposed legal action in the event of anticipated litigation. *See id*. These facts also indicate the email is protected by attorney work-product protections.

Finally, as Defendant has noted, the City has consistently maintained the information in Exhibit 4 is privileged, and Plaintiff has raised no argument to the contrary. *Compare* (Docs. 71, 158, 158-1) *with* (Doc. 161).

During the pretrial conference, Plaintiff's counsel was again pressed on Exhibit 4's admissibility. Draft Transcript of Pretrial Conference, 15–16 (taken January 10, 2025). This time, however, he parted from his claim that it was anonymously provided. Instead, he stated that Mr. Geier would authenticate it, and expected Mr. Geier would testify that:

He did have this [photographed email] – he did see this email on his computer. That's why we have –what we have is the quality that it is, is he took a picture of [the email] on his computer, printed it out, and transmitted that to [his attorney] Mr. Grover. I expect that that's what he's going to say. He had a tangential whistleblower retaliation litigation going on at the time with the City, and I think he was concerned that that would lead to further whistleblower retaliation to have shared the email.

So he'll be the one that will lay the foundation—we'll lay foundation through him. He'll authenticate it and that's how we would get to the point and discuss how he came to have that email. He's clearly on the email. His email address is listed there.

Draft Transcript of Pretrial Conference, 16:7–20 (take January 10, 2025). But, as Defendant argues, Mr. Geier cannot waive the City's privilege. (Doc. 158) at 4 (citing *Ross v. City of Memphis*, 423 F.3d 596, 604 (rejecting the claim that former city official could waive municipality's privilege: "[m]aking the City's ability to invoke attorney-client privilege contingent on litigation choices made by one of its former employees renders the privilege intolerably uncertain.")).

Based on the foregoing, and because Plaintiff has failed to meaningfully argue otherwise, the Court concludes that the email is properly privileged material and is therefore inadmissible.

B.  *Dismissal of the Case*

The Court next considers whether dismissal is an appropriate sanction in this case. Applying the five previously mentioned *Ehrenhaus* factors, the Court concludes dismissal is appropriate. Under the first and second factors, the Court finds that the degree of actual prejudice to Defendant and interference in the judicial process is severe. Exhibit 4 appears to be at the heart of Plaintiff's case, supporting his argument that the City had a policy to retaliate against him. *See* (Doc. 68).[3] With trial fast approaching, Plaintiff waited until the second

---

[3] Meanwhile, the City has requested information about the source of Exhibit 4 since early 2021. *See* (Doc. 71-2) at 1–2 (showing state court filings of Defendants requesting information related to the source of the emails at issue).

pretrial conference on January 10, 2025—less than 17 days from trial—to disclose that Mr. Geier

provided Plaintiff's counsel with the email string by way of his attorney, Mr. Grover.  A few

days later, Plaintiff's counsel doubled down on his admission that Mr. Geier was the source of

the email, stating:

> Jeremy was not told until later after this case was filed where the email comes from.
> He didn't know and we didn't know.  Mr. Grover never disclosed that information
> on behalf of Mike Geier until much later so in order to protect Mr. Geier as a
> whistleblower.  Neither you nor your predecessor asked Jeremy in discovery where
> he received the information, so therefore once Jeremy knew we never withheld that
> information….

(Doc. 158-3).  In Response to these admissions, Plaintiff attaches declarations by Mr.

Grover, and his attorney, Mr. Dunn claiming no knowledge of the email's source.  Mr. Grover,

for his part, maintains "[t]o this day, [he does] not know the source of that [email]," but claims

he does know that it was not Mr. Geier.  (Doc. 161-1) at 1.  He further maintains that he

represented this information to Mr. Dunn at the time he received this email and since.  *Id.*

Despite Mr. Grover's representations, Mr. Dunn apparently "incorrectly assumed" Mr. Geier was

the source of the photographed email.  *Id.* at 2.

Mr. Dunn, for his part, declares:

> To this day, [he] do[es] not know the source of that [email]. [He] had assumed that
> it come from Mr. Michael Geier to Mr. Grover because [he] knew Mr. Grover was
> representing Mr. Geier in other litigation, but [he] never asked Mr. Geier or Mr.
> Grover directly if Mr. Geier was the source of the leaked email.

(Doc. 161-2).  It was only on a phone call on Monday—presumably January 13, 2025—after his

email exchange with Defendant's counsel that "[he] learned that [he] was mistaken in [his]

assumptions that Mr. Geier had produced the Email from taking a picture of it on a computer

screen."  *Id.*

Plaintiff's Response only further muddies the waters. Despite Mr. Grover and Mr. Dunn's contentions, the Court is left wondering which admissions to believe. Mr. Dunn appeared quite certain at the pretrial conference that Mr. Geier was the source of Exhibit 4, even indicating the reasoning behind his failure to disclose sooner: because Mr. Geier was concerned about his whistleblower litigation against the City. Three days later, he maintained the same story and went further, indicating that his client, Mr. Dear, was told Mr. Geier was the source of the email, and that, in no uncertain terms, Mr. Grover only disclosed that information on behalf of Mike Geier much later in order to protect Mr. Geier as a whistleblower. (Doc. 158-3).

The Court is left asking: Who else would be motivated to take a picture of a computer screen and supply that screen shot of an email to Mr. Grover and then Mr. Dunn, if not Mr. Geier? To believe that this email arrived in Mr. Grover's office anonymously and not by way of Mr. Geier strains credulity. To suggest otherwise would be completely unreasonable. It also strikes the Court as highly suspect that even after Mr. Grover—who appeared as joint counsel with Mr. Dear in the underlying IPRA action, (Doc. 158) at 6 n.1—told him multiple times that Mr. Geier was not the source of Exhibit 4, (Doc. 161-1), Mr. Dunn apparently believed otherwise.

Mr. Dunn argues that Defendant's Motion "seeks to penalize Mr. Dear" for his mistaken assumption that Mr. Geier was the source of Exhibit 4. (Doc. 161) at 1–2. The Court, however, can more than reasonably infer Mr. Dear's role, in all this—after all Mr. Dunn indicated that Mr. Dear was told that Mr. Geier was the source, (Doc. 158-3), and Mr. Dunn's declaration does not include any indication that he also wrongly assumed the same. As Defendant points out in her reply, "Plaintiff's response only makes a further mess of an already unnecessarily messy

situation." (Doc. 162) at 1. Indeed, but while this situation may be a tangled web, the Court now has clarity.

Had Plaintiff and his counsel been forthright about the source of these emails, much of this litigation would likely have been avoided. Beyond Mr. Geier's vague, speculative affidavit, (Doc. 68-2), Exhibit 4 appears to be the only piece of evidence Plaintiff has proffered that might indicate whether retaliation was a substantial and motivating factor in Defendant's decision to authorize a counterclaim against him. And, even if the Court takes, for the sake of argument, Plaintiff's counsel's claim that the source of the email continues to remain unknown, the Court is convinced Plaintiff's counsel should have known that this email was privileged and therefore his attempt to use it was improper.

The third factor—culpability of the litigant—also weighs against Plaintiff. Culpability exists when it is demonstrated that a party acts with willfulness, bad faith, and fault, and makes calculated decisions for strategic use in litigation. *Xyngular v. Schenkel*, 890 F.3d 868, 874 (10th Cir. 2018). The Court does not appreciate Mr. Dunn's decision to deflect and downplay this matter rather than take responsibility. As this Court noted above, there is an obvious relationship between Mr. Dunn and Mr. Grover. Additionally, Mr. Grover and Mr. Dunn have appeared together as joint counsel of record for Mr. Dear in other cases against the City—including the underlying IPRA case which led to this lawsuit. (Doc. 158) at 6 n.1. Given all this, the Court cannot believe that Mr. Dunn or Plaintiff had no idea where the emails originated. Instead, it appears to this Court Mr. Dunn made a willful strategic—albeit poor—decision to continue improperly relying on Exhibit 4, maintaining it was anonymously received. The Court is unconvinced by Plaintiff's assertion that he or his counsel obtained Exhibit 4 "innocently." (Doc. 161) at 4. It appears to this Court that Exhibit 4's origin is being misrepresented.

As to the fourth factor, it is true, the Court has not warned Plaintiff and his lawyers that such conduct could lead to dismissal. This factor, however, is not dispositive. *Xyngular*, 890 F.3d at 874–75 (citing *Rogers v. Andrus Transp. Servs.*, 502 F.3d 1147, 1152 (10th Cir. 2007)). As in *Xyngular*, Plaintiff fails to "cite any authority holding that terminating sanctions in a case like this one necessarily require prior warning." *Id.* at 875.

As to the fifth factor, the Court is unconvinced lesser sanctions would be effective here. Having found Exhibit 4 inadmissible based on attorney-client privilege, it makes no difference if the Court were to also exclude Exhibit 4 as a sanction. The Court finds monetary sanctions are also insufficient. This litigation has been ongoing for nearly four years before this Court. And again, Mr. Dunn waited until only 17 days before trial to detail the source of an exhibit central to his case. Instead, he continued to obfuscate, unnecessarily prolonging this litigation and consuming judicial resources. The Court is unwilling to expend yet more judicial resources by calling in a jury and presiding over a trial. For these reasons, the Court concludes dismissal is the only effective sanction here.

Finally, as suggested throughout this Memorandum Opinion and Order, it is not clear that Plaintiff's case, as it stands now, would survive summary judgment without Exhibit 4. Defendant's first motion for summary argued that she was entitled to summary judgment based on qualified immunity. (Doc. 64) at 7–13. Because her argument only focused on whether she was entitled to qualified immunity, the Court found it unnecessary to consider whether the email exchange at issue was privileged. (Doc. 160) at 10 n.2.[4] Instead, the Court considered Defendant's qualified immunity argument and determined (1) Plaintiff's First Amendment rights

---

[4] The Court initially filed its Memorandum Opinion and Order on March 8, 2024, but later amended its order to correct two sentences: a heading on page five and a sentence on page nine. *See* (Doc. 138) at 15. The Amended Memorandum Opinion and Order is reflected in (Doc. 160).

were clearly established; and (2) that a reasonable official in Defendant's position could have known that filing a counterclaim against Plaintiff in response to his IPRA lawsuit could have violated his constitutional rights to petition the government. *Id.* at 5–9.

In denying Defendant's qualified immunity argument, the Court noted that it appeared Plaintiff could satisfy the three elements of a First Amendment retaliation claim. *Id.* Notably, the Court found Defendant's argument as to the third element—relating to Defendant's motivation for authorizing a counter claim—unclear and undeveloped. *See id.* at 7 ("Defendant's next argument [relating to the third element] unclear."). It now appears to the Court that without the privileged email, Plaintiff has likely failed to proffer evidence showing a genuine dispute of material fact that Defendant's authorization of the counterclaim was substantially motivated by a desire to retaliate against Plaintiff.

IV.    *Conclusion*

For the reasons discussed, the Court orders this case dismissed. Accordingly, the jury trial is hereby vacated.

IT IS SO ORDERED.

_____
CHIEF UNITED STATES DISTRICT JUDGE